UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NUMBERS LICENSING, LLC, a
Washington limited liability
company,

                    Plaintiff,

          v.

bVISUAL USA, INC., a Delaware
Corporation; bVISUAL GROUP
LTD., d/b/a VISUAL WORLD
DISTRIBUTION LTD., an Irish
Corporation; bVISUAL S.A., a
Panamanian Corporationl
STEPHAN ANTHONY LARSON; BRIAN
LARSON; JANE DOE LARSON, and
their marital community; TOM
BORKOWSKI, an individual; and
ALLAN HOLBROOK, an
individual,

                    Defendants.

NO. CV-09-65-EFS

**ORDER GRANTING DEFENDANTS
MOTION TO STRIKE AND DENYING
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

     A hearing occurred in the above captioned matter on July 8, 2009,
in Spokane.  Stacie Foster appeared on Plaintiff, Numbers Licensing,
LLC's behalf. Phillip Samouris and Chad Mitchell appeared on behalf of
Defendants' bVisual Inc, Stephan Larson, Brian Larson, and Alan Holbrook.
Helen Boyer appeared on Defendant Tom Borkowksi's behalf.  Before the
Court were Defendants'[1] motion to strike and Plaintiffs motion for

---

[1]     Motion was filed on behalf of Defendants' bVisual Inc, Stephan

ORDER * 1

preliminary injunction. (Ct. Recs. 47 & 9)  After reviewing the submitted material and the relevant authority, the Court is fully informed and grants Defendants' motion to strike and denies Plaintiff's motion for preliminary injunction.  This order serves to supplement and memorialize the Court's oral rulings.

## I.    BACKGROUND[2]

### A.    bVisual's Creation

Tony and Brian Larson founded bVisual in February 2005. (Ct. Rec. 45-3 at 2.)  bVisual's business is developing internet-based audio and video conferencing services. *Id*. At the outset, Tony Larson constructed the conceptual framework for this internet-based video conferencing platform ("the System").  (Ct. Rec. 66 at 3.)  Then, in April 2005, bVisual started hiring outside software engineers to turn Tony Larson's vision into reality. *Id*.

### B.    bVisual's Hires and Compensation Structure

bVisual's first additional software engineer hire was John C. Oelund.  (Ct. Rec. 45-3 at 3.)  Mr. Oelund helped bVisual develop the

---

Larson, Brian Larson, and Alan Holbrook.  Defendant Borkowski joined the motion.

[2]    In developing the background, the Court resolved existing factual disputes after reviewing the submitted evidence. *See generally*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007); *Thomas v. County of Los Angeles,* 1993 U.S. App. LEXIS 2165 at *10-11 (9th Cir. Feb. 12, 1993).  These factual findings are for purposes of this preliminary injunction only and are not binding. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

ORDER * 2

System's video transmission and screen-sharing source code. *Id*. When Mr. Oelund left bVisual for personal reasons in June 2006, he had been compensated $105,000.00 in cash and stock for his services and understood that bVisual had full rights to the code he developed. (Ct. Rec. 45-5 at 3.)

bVisual's second software engineer hire was Rand Renfroe. (Ct. Rec. 45-3 at 3.) Mr. Renfroe worked for Numbers Consulting, Inc., a corporation he formed with his wife, Jan Renfroe, in March 2002. (Ct. Rec. 66 at 2.) Mr. Renfroe, with feedback and direction from Tony Larson and others, created the source code, i.e., the blueprints, for the System. (Ct. Recs. 45 at 3-5; 66 at 4-6.) Over the course of three (3) years, bVisual paid Mr. Renfroe $370,000.00 in cash plus 21,965 shares of bVisual stock for his services. (Ct. Recs. 45-3 at 8; 66 at 2.) bVisual did not pay Mr. Renfroe directly; instead, Numbers Consulting, Inc. ("Numbers") billed and collected for Mr. Renfroe's services. (Ct. Recs. 10, Ex. A; 66 at 2.) Numbers was also responsible for Mr. Renfroe's tax obligations and employee benefits. (Ct. Recs. 64 at 2; 62 at 2; 45-3 at 7.)

bVisual's third additional software engineer hire was Tom Borkowski. (Ct. Rec. 45-6.) Mr. Borkowski helped bVisual develop the System's audio source code. *Id*. bVisual compensated Mr. Borkowski approximately $250,000.00 in cash and stock for his services; Mr. Borkowski understood that bVisual had full rights to the code he developed. *Id*. at 2.

## C.  **Mr. Renfroe's Employment**

Mr. Renfroe worked with bVisual from July 2005 until November 2008. (Ct. Rec. 45-3 at 3.) During this time, he signed bVisual's non-disclosure agreement, which required him to keep information confidential

ORDER * 3

while fulfilling his "transactional services" for bVisual. (Ct. Rec. 45-3, Ex. 1.)  Mr. Renfroe did not sign (either as an individual or on behalf of Numbers Consulting, Inc.) a contract with bVisual detailing compensation, scope of work, or ownership of the intellectual property rights being created.

With a few exceptions, Mr. Renfroe developed the System's source code on his own schedule from an office provided by Numbers Consulting, Inc. (Ct. Rec. 66 at 3.)  He provided daily progress reports to bVisual and delivered updated versions of the source code approximately every two (2) weeks.  (Ct. Rec. 45-3 at 5.)  Tony Larson, Mr. Renfroe, and others would then discuss the recent updates and what "tweaks" needed to be made. (Ct. Rec. 66 at 6-7.)  Tony Larson's role in the System's development was largely supervisory; that is, while Mr. Larson was involved in general discussions about the System's overall design, features, and possible ways to fix software bugs, he never performed "brass tacks" tasks such as technical code review because he lacked the ability to write or understand "code drafting languages" such as C++, C#, or the .Net platform.  (Ct. Rec. 66 at 6.)

As the System's development progressed, Mr. Renfroe began adding copyright notices in the source code, which read: "Numbers Consulting for bVisual, copyright." (Ct. Rec. 45-3 at 5.)  In fact, in 2007, Mr. Renfroe explicitly asked bVisual for guidance on how the System's copyright notice should read in the code. (Ct. Rec. 45-3, Ex. 5.)

With respect to equipment and development, bVisual purchased three (3) software development tools and miscellaneous telecommunications equipment to assist Mr. Renfroe in developing the System's source code. (Ct. Rec. 45-3 at 4.)  bVisual also paid various software engineers to

test source code for bugs.  (Ct. Rec. 45-3 at 5.)  Otherwise, all of Mr. Renfroe's equipment - including computers, test computers, and other standard development tools - were purchased by Numbers Consulting, Inc. for Mr. Renfroe's use.  (Ct. Rec. 66 at 5.)

After years of development, bVisual conducted a limited beta test of the System in February 2008.  (Ct. Rec. 45-3 at 6.)

**D.   Fallout**

Shortly after the February 2008 beta test, bVisual ran out of start-up capital and stopped paying every invoice that Numbers Consulting, Inc. submitted on Mr. Renfroe's behalf.  (Ct. Recs. 10, Ex. A; 11 at 3; 66 at 8.)  In November 2008, Mr. Renfroe demanded - not accounting for the unpaid invoices - a 100,000-share bonus for "killing [himself] to get this product done." (Ct. Rec. 45-3, Ex. 6.)  Tony Larson countered with a $500,000.00 bonus proposal.  Mr. Renfroe rejected the offer, stopped all work on the System, and formally resigned all services to bVisual. (Ct. Recs. 45-3, Ex. 6; 66 at 8.)

Around the same time, Numbers Consulting, Inc. began the process of obtaining an expedited copyright registration for the System's video source code. (Ct. Rec. 11 at 3.)  In early December 2008, Numbers Consulting, Inc. transferred all of its right, title, and interest in the System to Numbers Licensing, LLC.[3]  *Id.*  Shortly thereafter, Numbers

---

[3]    Numbers Consulting, Inc., is the entity which provided services. Numbers Licensing, LLC., is the entity created simply for copyright ownership purposes.  Both entities are wholly owned by the Renfroes; therefore for purposes of this motion, "Numbers" refers to the entities collectively.

ORDER * 5

Licensing LLC received a Copyright Certificate of Registration for the System. (Ct. Rec. 11, Ex. B.)

In February 2009, the Renfroes learned that bVisual had hired other software engineers to modify the System's source code. (Ct. Rec. 66 at 8.)  Unwilling to let other "technologically proficient individuals" view, copy, and modify Numbers' copyrighted source code, they filed the copyright infringement action and preliminary injunction request now before the Court.  (Ct. Rec. 63, Ex. A.)

## II.    DISCUSSION

### A.   bVisual's Motion to Strike (Ct. Rec. 47)

bVisual moves to strike selected paragraphs from Jan Renfroe's Declaration as hearsay, unsupported generalities, and conclusory legal characterizations. (Ct. Rec. 49 at 2.)   Numbers counters that Ms. Renfroe's declaration, to the extent that it is deficient, is cured by subsequently-filed declarations and considers the issue moot. (Ct. Rec. 68 at 1-2.)

Federal Rule of Civil Procedure 65, which addresses preliminary injunctions, does not state the minimum evidentiary criteria required for declarations submitted in support of preliminary injunctions; Rule 56, however, provides a useful guide.  Rule 56 states that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1).  An exception to this rule permits a district court to consider otherwise inadmissible evidence when ruling on a preliminary injunction if exigent circumstances exist (e.g., a time-sensitive issue requiring expedited briefing where evidentiary compliance cannot be obtained). *See Flynt*

ORDER * 6

*Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.").

Here, bVisual identified valid evidentiary deficiencies in Ms. Renfroe's declaration.  For example, Ms. Renfroe alleges in ¶ 4 that her husband was paid $60.00 an hour for his services.  Ms. Renfroe lacks personal knowledge to make such a statement. And because there are no exigent circumstances warranting a deviation from Rule 56(e) (Numbers had several months to obtain declarations from the proper people after learning of bVisual's infringing activities), full compliance with the evidentiary rules is appropriate and the deficient paragraphs are properly stricken.  It should be noted that Numbers essentially admits to the deficiencies in its opposition. (Ct. Rec. 68.)[4]

**B.   Numbers' Motion for Preliminary Injunction (Ct. Rec. 9)**

    **1.   Necessity for an Evidentiary Hearing**

As an initial matter, it is necessary to decide whether the Court should hold an evidentiary hearing before ruling on the preliminary injunction.[5] An evidentiary hearing need not occur as a matter of course before a district court rules on a preliminary injunction. *Kenneally v. Lungren*, 967 F.2d 329, 334 (9th Cir. 1992) (citation omitted).  "[I]f the disputed [] facts are simple and little time would be required for an

---

[4]   This ruling has little to no effect on the preliminary injunction motion because Numbers submitted admissible equivalent evidence in subsequently-filed declarations.

[5]   The parties did not request an evidentiary hearing.

ORDER * 7

evidentiary hearing, proceeding on affidavits alone might be inappropriate.  But an evidentiary hearing should not be held when the magnitude of the inquiry would make it impractical." *Int'l Molders' & Allied Workers' Local Union, No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986).

The Court finds that an evidentiary hearing is unnecessary; the declarations on file provide a sufficient basis for the Court to make an informed decision.  Moreover, the complex nature of the disputes cannot be practically resolved in an evidentiary hearing.  For example, resolving the copyright ownership question will require detailed inquiries into Tony Larson's involvement in the System's source code design - this will likely require expert testimony regarding computer programming.  Practical resolution in an evidentiary hearing therefore would be difficult.  As such, it is appropriate to rule on the motion without holding an evidentiary hearing. *See id.* at 555.

## 2.  Preliminary Injunction Standard

"A preliminary injunction is not a preliminary adjudication on the merits: it is an equitable device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Textile Unlimited v. A..bmhand Co.*, 240 F.3d 781, 786 (9th Cir. 2001). Preliminary injunctive relief is available to a party who demonstrates either: 1) a combination of probable success on the merits and the likelihood of irreparable harm; or 2) that serious questions as to success on the merits are raised and the balance of hardships tips in its favor. *Stormans, Inc. v. Selecky*, No. 07-36039, op. at 8465-66 (9th Cir. July 8, 2009) (citations omitted).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable

harm increases as the probability of success decreases." *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  Given that two related but independent avenues exist for obtaining a preliminary injunction, each test will be addressed in turn.

### 3.    First Test: Probable Success on the Merits and the Likelihood of Irreparable Harm

#### A.    Probable Success on the Merits

##### 1)    Prima Facie Case of Copyright Infringement

Numbers claims that it can establish probable success on the merits because it owns a registered copyright in the System's source code.  To establish probable success on the merits, Numbers must first demonstrate a prima facie case of copyright infringement, which requires a showing of 1) ownership of the copyright, and 2) copying of an expression protected by the copyright. *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989).

The Court finds that Numbers establishes a prima facie case of copyright infringement.  First, Numbers holds a copyright certificate of registration in the System's video source code, which constitutes prima facie evidence of copyright validity. *See* 17 U.S.C. § 410(c) (2009); *see also Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995) (noting that production of a certificate of registration raises a presumption of validity in a copyright).  Second, it is undisputed that bVisual has a copy of the System's source code and is using and modifying it. (Ct. Recs. 13 ¶ 38-39; 63-2, at 5.)

##### 2)    Defenses

Although Numbers can establish a prima facie case of copyright infringement, bVisual raises the following four (4) infringement

ORDER * 9

defenses: 1) bVisual owns the copyright under the "work-made-for-hire" doctrine; 2) bVisual has rights to use and modify the work under an implied license; 3) bVisual owns the work as a purchaser of computer software; and 4) Numbers' failure to identify the specific work at issue precludes the Court from issuing a preliminary injunction as a matter of law.  Each defense is addressed in turn.

### a.    Work-Made-for-Hire Exception

bVisual argues that Numbers' copyright ownership is invalid under the work-made-for-hire exception because 1) Mr. Renfroe was working as an "employee" of bVisual, and 2) bVisual ordered the work for use as contribution to a "collective work." (Ct. Rec. 45 at 4.)

The Copyright Act provides that a protected work vests initially in the work's author or authors.  17 U.S.C. § 201(a).  Under the work-made-for-hire exception, however, copyright ownership will vest with an author's employer or in a third party in two (2) scenarios: 1) when a work is prepared by an employee within the scope of his or her employment; or 2) when a work is specially ordered or commissioned for use as a contribution to a collective work and the parties expressly agree in a written statement signed by them that the work shall be considered a work-made-for-hire. *Id.* §§ 101, 201(b).

### i.    First Exception - Scope of Employment

Turning to the first work-made-for-hire exception, bVisual argues that Mr. Renfroe was a bVisual employee and, therefore, that it owns the System's source code copyright. (Ct. Rec. 45 at 5-6.)  Numbers responds that Mr. Renfroe was an independent contractor, not a bVisual employee.

When determining whether a hired party is an "employee" under the work-made-for-hire exception, courts apply common law agency principles,

ORDER * 10

which identify the following non-determinative factors: 1) the hiring party's right to control the manner and means by which the product is accomplished; 2) the skill required to complete the task; 3) the extent of the hired party's discretion over when and how long to work; 4) the method of payment; 5) the source of the instruments and tools used; 6) the location and duration of the relationship and work; 7) the extent to which the hiring party has the right to assign additional projects; and 8) the tax treatment and the provision for employee benefits provided to the hired party. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989) (citation omitted).

The Court finds that Mr. Renfroe was an independent contractor and not a bVisual employee based on the following seven (7) facts: First, since 2002, Mr. Renfroe worked for Numbers Consulting, Inc., a corporation that he formed with his wife, and provided services to bVisual[6] through Numbers. Numbers then sent weekly invoices to bVisual for Mr. Renfroe's work. (Ct. Recs. 45-3 at 3; 66 at 2 ¶¶ 4-5.) Second, Numbers was responsible for Mr. Renfroe's payroll obligations, tax obligations, and employee benefits. (Ct. Recs. 64 at 2; 62 at 2; 45-3 at 7.) Third, although bVisual purchased some software development tools and miscellaneous telecommunications equipment for Mr. Renfroe's use, Numbers supplied much of the equipment used, including computers, test computers, and other standard development tools. (Ct. Recs. 45-3 at 4; 66 at 5.) Fourth, while it is true that Tony Larson was heavily involved in some aspects of the source code's creation, he was not capable of

---

[6]    Mr. Renfroe did not work for anyone else during this time. (Ct. Rec. 45-3 at 3 ¶ 7).

detailed code review.  As such, Mr. Renfroe's services were sought for a specific purpose - his specialized programming knowledge.  bVisual therefore had no right to assign additional projects to Mr. Renfroe as they would to a regular, salaried employee. (Ct. Recs. 45-3 at 3 ¶ 7; 60-2 at 5; 66 at 4 ¶ 12.)  Fifth, while Mr. Renfroe would go to bVisual's office on occasion to de-bug software, he wrote the System's source code primarily at his Numbers' office on his own schedule, with discretion as to how he performed his work.  (Ct. Rec. 66 at 3 & 5 ¶¶ 12 & 25.)  Sixth, while Mr. Renfroe is alleged to have held himself out as bVisual's Chief Technology Officer, there are instances where Mr. Renfroe explicitly denies being a bVisual employee.  For example, when signing a document acknowledging receipt of bVisual's employee handbook, Mr. Renfroe specifically crossed out "employee" and wrote "contractor" before signing the acknowledgment. (Ct. Recs. 45-3 at 8 ¶ 19; 45-3 Ex. 6 & 10; 66 at 2 ¶ 6.)  Seventh, communication between bVisual and Mr. Renfroe is replete with a "we" versus "you" mentality.  By way of example, the confidentiality agreement Mr. Renfroe signed states "**You** . . . will receive confidential and secret information from bVisual . . . for the purpose of fulfilling your services **to the company** ('Transaction')." (Ct. Recs. 45-3, Ex 1, Ex.6, & Ex. 10.)

These facts, when taken together, support a finding that Mr. Renfroe was an independent contractor.  *See Reid*, 490 U.S. at 752-53 (finding independent contractor status when a highly skilled sculptor was working on his own time, in his own studio, supplying his own tools, and was provided neither employee benefits nor placed on the company payroll).[7]

---

[7]    While Mr. Renfroe did write on one occasion that "I've worked

### ii.  Second Exception - Collective Works

Turning to the second work-made-for-hire exception, bVisual argues that they are the original copyright owners because the code was part of a collective work in the System as a whole. (Ct. Rec. 45 at 8-9.) Numbers claims that this position is unfounded because the parties did not execute a signed, written agreement expressing this intent. (Ct. Rec. 60-2 at 7.)

A signed writing expressing the intent to have a work-made-for-hire is a prerequisite to establishing a collective work. 17 U.S.C. § 101(2). The writing requirement accomplishes Congress's intent to have certainty in copyright disputes. *See Reid*, 490 U.S. at 749 (noting that "with [a writing requirement], the parties at the outset can settle on relevant contractual terms, such as the price for the work and the ownership reproduction rights.").

The Court finds that the second work-made-for-hire exception is inapplicable.  Neither party produced a signed, written agreement expressing an intent to place initial ownership rights with bVisual.  The work-made-for-hire exception therefore lacks the necessary writing component.  bVisual argues that the writing requirement is evidenced through the "communication" embedded in the source code where Mr. Renfroe added the copyright notice "Numbers Consulting for bVisual, copyright." This position is untenable and is inconsistent with the Congressional intent to have certainty in copyright ownership at the outset.  Moreover,

---

for this company for the last three years. . .," the Court places little emphasis on this e-mail because it is unclear whether Mr. Renfroe is referring to his status as a contractor. (Ct. Rec. 45-3, Ex. 6.)

ORDER * 13

to the extent that these code entries satisfy the writing requirement, they lack the parties' signatures. *See id.* at 750.[8]

### iii. Summary: Work Made for Hire

In sum, neither work-made-for-hire exception applies. bVisual cannot, for purposes of this preliminary injunction, establish that Mr. Renfroe was a bVisual "employee" or that Mr. Renfroe produced the work under the specially-ordered collective work. Therefore, bVisual cannot establish original copyright ownership.

### b.    Implied License

bVisual next argues that if it cannot establish initial copyright ownership, then, at a minimum, it has an implied license to use the System's source code. (Ct. Rec. 45 at 10.) Numbers disagrees, arguing that it has not granted bVisual a license, implied or otherwise, to use the copyrighted work. (Ct. Rec. 60-2 at 10.)

Though exclusive licenses must be in writing, grants of non-exclusive licenses need not be in writing, and may be granted orally or by implication. *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008) (*cert. denied*). An implied license will be found when 1) a person (the licensee) requests the creation of a work, 2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and 3) the licensor intends that the licensee-requestor

---

[8]    bVisual's reliance on *Warren v. Fox Family Worldwide*, 328 F.3d 1136, 1141 (9th Cir. 2003), for the proposition that an employment agreement does not require specific "work-made-for-hire" language is unpersuasive. In *Fox*, a written agreement existed placing copyright ownership with the hiring party. Here, there is no agreement.

ORDER * 14

copy and distribute his work.  *Id*. at 754-55. "[T]he relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct." *Id*. at 756. Because Numbers concedes that the first two (2) requirements for an implied license exist, only the third requirement - licensor's intent - merits discussion. (Ct. Rec. 60-2 at 10.)

The Ninth Circuit finds three (3) factors persuasive in determining a licensor's intent to convey a license: 1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; 2) whether the creator utilized written contracts providing that copyrighted materials could only be used with the creator's future involvement or express permission; and 3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible. *Gagnon*, 542 F.3d at 756 (citations omitted).  These are known as the *Gagnon*-intent factors.

The Court finds that bVisual obtained an implied license to continue using and modifying the System's source code.  Under the three (3) *Gagnon*-intent factors, Numbers has not introduced objective evidence of intent to retain ownership in the copyright before resigning services from bVisual.

Under the first *Gagnon*-intent factor (short-term transaction versus ongoing relationship), the Ninth Circuit, unfortunately, has not yet clarified whether the existence of an ongoing relationship favors an implied license finding.  *See id*.[9]  Numbers argues that the ongoing

---

[9]    It should be noted, however, that while the Ninth Circuit's

ORDER * 15

relationship here created an expectation of future involvement sufficient to establish that Mr. Renfroe did not intend to grant bVisual a license. (Ct. Rec. 60-2 at 11.) This argument is unpersuasive. Mr. Renfroe, like the software developer in *Gagnon*, was an independent contractor, a status that should not create any long-term or permanent expectations of involvement in the company. Moreover, the ongoing relationship provided numerous opportunities for Mr. Renfroe to communicate his intent to deny bVisual a license. Instead, three-and-a-half years passed before Mr. Renfroe made known his intent to retain his rights in the System's source code. In fact, he was silent about his ownership when licensing was discussed (e.g., upon request, Mr. Renfroe inserted bVisual's End User License Agreement into the System's source code but did not claim ownership in the license). (Ct. Rec. 45 at 9.)

Under the second *Gagnon*-intent factor (creator's use of a written contract), Numbers' failure to obtain a written agreement retaining licensing rights supports finding of an implied license. Not only was there no agreement, but also bVisual and Numbers never discussed licensing arrangements and Numbers never denied bVisual a license until the relationship ended. When a license has not been denied and substantial sums of money are paid for the copyrighted work, the absence of a licensing agreement supports the finding of an implied license. *See Gagnon*, 542 F.3d at 757 (noting that a belated statement denying a

_____

decision in *Gagnon* lacked substantive analysis of the first *Gagnon*-intent factor, it ultimately found that an implied license existed when the parties had an ongoing three-and-a-half year relationship.

ORDER * 16

license is not sufficient after substantial sums were paid for the work); *see also Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) (noting that if no implied license was found, the plaintiff's contribution would be of minimal value - a conclusion that cannot be squared considering the plaintiff was paid $56,000 for his work). Similarly, because Numbers was paid a substantial sum - both in money and stock - for the delivery of the System's source code, an implied license should be found absent objective factors indicating the denial of a license. No substantive evidence that Numbers denied bVisual a license at the time of the System's delivery has been introduced.

Under the third *Gagnon*-intent factor (the creator's conduct), Mr. Renfroe's conduct on three (3) separate occasions objectively demonstrates that he did not intend to deny bVisual use of the System's source code. First, Mr. Renfroe inserted the copyright notice "Numbers Consulting for bVisual, copyright" 112 times in the source code.[10] No claims of copyright ownership were made by Mr. Renfroe at this time. Second, Mr. Renfroe confirmed to Brian Larson that bVisual would be the owner of the copyrights in the program when discussing the insertion of the End User License Agreement into the code. (Ct. Doc. 45-4 at 2 ¶ 2.)

---

[10] While Plaintiff argues that "Numbers Consulting for bVisual, Copyright" is ambiguous and does not demonstrate intent to grant copyright ownership to bVisual, the Court does not find this language ambiguous; Mr. Renfroe explicitly asked bVisual for guidance on how the System's copyright notice should read in the code. (Ct. Rec. 45-3, Ex. 5.)

Again, Mr. Renfroe made no claims of copyright ownership. *Id*.   Third, according to Tony Larson, from February 2008 until the time that Mr. Renfroe resigned his services, he was aware of the licensing and subscription management process used by bVisual in its beta test to obtain licensing agreements and fees from end-users of the bVisual system. (Ct. Rec. 102 at 4 ¶ 11.)  No copyright ownership claims was made by Mr. Renfroe with respect to the subscriber license fees collected by bVisual. *Id*.

### c.   Other defenses

Given the strength of bVisual's implied license defense, it is unnecessary to consider the remaining two (2) defenses.

### B.   Irreparable Harm

Under the circumstances, consideration of irreparable harm is also unnecessary; bVisual's implied license defense raises serious questions to the probability that Numbers will succeed on the merits.

### C.   Summary: First Test

In sum, the Court finds that bVisual's implied license defense raises serious questions to the merits of Numbers' copyright infringement claim; therefore, Numbers cannot demonstrate probable success of this claim for purposes of this motion.

Given that two (2) related, but independent tests exist for obtaining a preliminary injunction, the Court now turns to the second test.

### 4.   Second Test: Serious Questions are Raised and the Balance of Hardships Tips in Favor of the Moving Party.

In evaluating the balance of hardships, a court must consider the impact that granting or denying a motion for a preliminary injunction

will have on the respective enterprises. *Int'l Jensen, Inc. v. Metrosound, U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

### 1)    Hardships for Numbers

Numbers argues in its briefing that the balance of hardships tips in its favor because a failure to grant an injunction will cause irreparable harm in terms of lost sales, customer goodwill, and loss of an unfair competitive advantage. (Ct. Rec. 9 at 8.)   During oral argument, Numbers argued that bVisual's ability to view and modify the genius and creative expression in the code will result in irreparable injury to Numbers.

The Court finds both arguments unpersuasive.  First, Numbers is not in the sales business;  rather, the company provides programming and accounting services.  Further, while the video portion of the source code created for the bVisual system may be independently marketable, no such market has been identified and no potential buyers have been discussed. In addition, it is unclear what goodwill is at risk and with what customers.  Numbers has very few customers.   In fact, for three-and-a-half years, bVisual was Numbers' sole client or customer.   Since resignation of services to bVisual, Numbers has only indicated one (1) other client. (Ct. Rec. 66, Ex. D.)   Lastly, an unfair competitive advantage, if one exists, only exists with bVisual.  For three-and-a-half years, Numbers was working for and with bVisual, in concert, not in competition, and given that bVisual has demonstrated in the preliminary injunction stage rights to a non-exclusive license in the copyright, any competition between the companies related to these rights hardly seems unfair.

Second, if Numbers was concerned that others might be able to view the creative genius in the code, it would not have filed exhibits containing Mr. Renfroe's genius in the public record.   Counsel for Numbers admitted that the documents filed contained commercially sensitive information related to particular portions of the software code and contained particular system architecture designs. (Ct. Rec. 70 at 2.) Competitors could use the information to develop competing products. *Id*. Though these exhibits have since been sealed, Numbers' argument has lost credibility with the Court.

Although the Court finds Numbers' hardship arguments unpersuasive, the Court nevertheless turns to bVisual's hardships.

### 2)   Hardships for bVisual

bVisual claims that a preliminary injunction would cause hardship far beyond lost profits because the company and its shareholders "stand to lose everything," including three (3) years of work and over $3 million in development expenses. (Ct. Rec. 45 at 19.)   While it may be unlikely that it will in fact lose everything, bVisual has had difficulty raising additional venture capital as a result of delays caused by Mr. Renfroe's departure. (Ct. Rec. 63-2 at 5, Ex. A.) Continued delays will prevent bVisual from launching the System and prevent the company from getting off the ground.   In addition to all other shareholders, Mr. Renfroe also stands to lose his ownership interest if the company fails.

In sum, the Court finds that the balance of hardships does not tip in Numbers' favor; instead, it appears to tip in bVisual's favor.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Strike **(Ct. Rec. 47)** is **GRANTED.**

    2. Plaintiff's Motion for Preliminary Injunction **(Ct. Rec. 9)** is **DENIED.**

    **IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and distribute copies to counsel.

    **DATED** this ____15th____ day of July 2009.


                         _____S/ Edward F. Shea_____

                              EDWARD F. SHEA
                         United States District Judge

Q:\Civil\2009\65.PI.wpd

ORDER * 21